UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LANCE FARROW,

               Petitioner,                                    Hon. Janet T. Neff

v.                                                 Case No. 1:09-CV-518

CINDI CURTIN,

               Respondent.
_____/


## REPORT AND RECOMMENDATION

        This matter is before the Court on Farrow's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Farrow's petition be **denied**.


## BACKGROUND

        As a result of events that occurred on or about December 17, 2005, Petitioner was charged with one count each of armed robbery, kidnapping, first degree home invasion, and possession of marijuana, as well as three counts of possessing a firearm during the commission of a felony, two counts of being a felon in possession of a firearm, and two counts of resisting and opposing a police officer. (Trial Transcript, June 6, 2006, 18-20). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**Jason Montgomery**

As of December 17, 2005, Montgomery resided at 44 New England Street in Battle Creek. (Trial Transcript, June 6, 2006, 127-28). At approximately 10:00 a.m. that morning, Montgomery exited his residence with his dog. (Tr. 131-36). Upon exiting the residence, Montgomery was confronted by Petitioner, who was brandishing a pistol. (Tr. 131-39, 143). Petitioner was wearing a sweatshirt, Carhart jacket, and light colored boots. (Tr. 138-41).

Petitioner instructed Montgomery to "get on [his] hands and knees" and return to the residence. (Tr. 143-44). Montgomery, followed by his dog, returned to the residence with Petitioner following behind. (Tr. 144). When the group entered the residence, Montgomery was instructed to put his dog in his kennel. (Tr. 144). Petitioner told Montgomery that "he had been here before and he knew what was up." (Tr. 144-45). Petitioner then ordered Montgomery to proceed to his bedroom. (Tr. 144).

Upon entering the bedroom, Montgomery was directed to a closet in which a safe was located. (Tr. 145). Petitioner ordered Montgomery to open the safe, which he did. (Tr. 145-47). When Petitioner realized that the safe only contained "marijuana paraphernalia," but no marijuana, he became "very angry." (Tr. 146-47). Petitioner asked Montgomery "where is the shit at?" (Tr. 147). Petitioner then began looking through Montgomery's dresser where he discovered marijuana in sandwich baggies. (Tr. 147-48). Petitioner "grabbed the marijuana and shoved it in his pockets." (Tr. 148). Petitioner also took Montgomery's wallet, a digital scale, and some jewelry belonging to Montgomery's girlfriend. (Tr. 148-52). When Montgomery then asked Petitioner to leave because he "had came and got what he wanted," Petitioner discharged his weapon in Montgomery's direction. (Tr. 148-49). Petitioner then hogtied Montgomery using duct tape and exited the

residence.  (Tr. 150-51).  At the time, the only telephone in the house was Montgomery's cell phone which was located in the kitchen.  (Tr. 155).

After hearing the back door to his residence close, Montgomery struggled to the kitchen where he was able to cut himself free.  (Tr. 154-56).  Montgomery then exited his residence through the back door at which point he observed Petitioner "cutting back through the yards at a 45 degree angle towards Taft" street.  (Tr. 161-62).  Montgomery dialed 911 and relayed this information to the dispatcher.  (Tr. 162).  Several police officers subsequently arrived at Montgomery's residence to investigate matters. (Tr. 161-64).  Montgomery provided the police with a detailed description of Petitioner. (Tr. 161).  Approximately 45 minutes later, the police informed Montgomery that they had just detained a suspect.  (Tr. 164).  Montgomery was then transported by the police to a nearby location where he identified the suspect in question as the man that had robbed and assaulted him only a short time earlier.  (Tr. 164-66).


**Tenaya Collins**

As of December 17, 2005, Collins resided at 44 New England Street in Battle Creek. (Trial Transcript, June 6, 2006, 175-76).  At approximately 9:30 a.m. that morning, Collins exited the residence.  (Tr. 176-77).  She did not, however, lock the back door when she left because Jason Montgomery was at home and was preparing to take the dog outside.  (Tr. 177).

Later that morning, Collins received a telephone call from Montgomery informing her that he had just been "robbed at gunpoint."  (Tr. 178).  Collins immediately returned home, arriving "maybe five minutes" before the police.  (Tr. 178).  When Collins arrived home, Montgomery still had duct tape "on both of his hands. . .and around both of his feet."  (Tr. 178).

3

Collins did not know Petitioner and had never given him permission to enter her residence.  (Tr. 179).

**Nichole Marshall**

As of December 17, 2005, Marshall was employed as a City of Battle Creek Police Officer.  (Trial Transcript, June 6, 2006, 186-87).  That particular morning she was on patrol with Officer Mark Kusler.  (Tr. 187).  Upon hearing a dispatch concerning a home invasion on New England street, Marshall and Kusler proceeded in the general direction of Jason Montgomery's residence. (Tr. 187-88).  Before arriving at Montgomery's residence, however, Marshall learned that a suspect matching the description of Montgomery's assailant had been spotted "near the Winding Way apartments."  (Tr. 188).

Marshall and Kusler proceeded immediately to the Winding Way apartments and exited their vehicle. (Tr. 188-92).  The pair immediately encountered two boys who informed them that a man had just "run into the building."  (Tr. 192-93).  When Marshall and Kusler entered the building, they immediately "heard a thumping coming from upstairs."  (Tr. 193-95).  Marshall and Kusler remained in the entryway.  (Tr. 195).  Petitioner then "came around the corner rather quickly as if he was going to come downstairs," but upon seeing the two police officers Petitioner "turned to his right and then acted as if he was going into apartment C."  (Tr. 195-97).

Petitioner told the officers that he "had been upstairs to visit his sister" and was now "on his way to [visit]. . .a friend or family member that lived in apartment D."  (Tr. 196).  At this point, Officer Kusler asked Petitioner to "come outside."  (Tr. 196).  Because the officers had been informed that Montgomery's assailant was armed, Officer Kusler began to pat Petitioner down to

4

make sure he was not armed.  (Tr. 197).  In so doing, Officer Kusler discovered that Petitioner was

carrying a digital scale and several bags of what appeared to be marijuana.  (Tr. 197-98, 201).

Officer Marshall then reached to investigate "a bulge" in Petitioner's front sweatshirt pocket.  (Tr.

198).  However, before she could accomplish this maneuver, Petitioner tried "pulling away from"

the officers and began "swinging his arms" at the officers.  (Tr. 198-99).  The officers were able to

"bring [Petitioner] down to the ground," but Petitioner continued to resist the officers' instructions.

(Tr. 199-201).  Petitioner was eventually subdued, at which point the officers discovered that

Petitioner was in possession of various items stolen from Jason Montgomery's residence earlier that

day.  (Tr. 154, 180-81, 202).  A short time later, a maintenance worker for the apartment complex

informed Officer Marshall that he had just "found a wallet and some jewelry" laying "on the

ground."  (Tr. 202-05).


**Mark Kusler**

As of December 17, 2005, Kusler was employed as a City of Battle Creek Police

Officer.  (Trial Transcript, June 6, 2006, 211-12).  Kusler was on patrol with Officer Marshall that

morning when he received a dispatch that an armed robbery occurred at 44 New England Street.  (Tr.

212).  Subsequent "radio traffic" provided a "description of the suspect."  (Tr. 212-13).  Before

arriving at Jason Montgomery's residence, Kusler and Marshall were directed to an apartment

complex where a suspect had been sighted.  (Tr. 212-13).

Upon arriving at the apartment complex, Kusler encountered a boy who "pointed

towards the entrance of the apartment building and said, 'yeah, he just went in there.'" (Tr. 213-14).

When Kusler entered the building, he immediately heard "thumping noises, like somebody was

5

running up the stairs or down a hallway or something." (Tr. 214-15). Kusler stopped at which point he observed Petitioner "come down from the third floor onto the second floor platform." (Tr. 215-17). Petitioner then "made a left turn to go down the set of stairs" directly in front of where Kusler was standing on the ground floor. (Tr. 215). However, when Petitioner saw Officer Kusler he "kind of stopped and looked surprised [and] immediately turned to his right and started knocking on" the door of a nearby apartment. (Tr. 215). Upon seeing Petitioner, Kusler "thought it was the person we were looking for because he fit the exact description." (Tr. 216).

Petitioner told Kusler that he was "coming from his sister's apartment." (Tr. 217). When asked why he was knocking on the door of another apartment, Petitioner replied that he "was going to some friend's house." (Tr. 217). When Petitioner exited the building, Kusler "started a pat down search" because he was aware that Montgomery's assailant had been armed. (Tr. 217-18). This search revealed that Petitioner was carrying marijuana and a digital scale. (Tr. 219). At this point, Officer Kusler attempted to handcuff Petitioner. (Tr. 219-20). Petitioner responded by "pushing" Kusler and "trying to get away." (Tr. 219-20). Petitioner was quickly subdued and taken into custody. (Tr. 220-21). Officer Kusler was then informed that Petitioner's weapon had been located in the apartment building "on the stairs next to the second floor platform." (Tr. 221-22). Kusler was later informed that one of the apartment complex's maintenance workers had located Jason Montgomery's wallet and jewelry. (Tr. 152-53, 226-28).


**Richard Parlier**

As of December 17, 2005, Parlier was employed by Glenwood Trace Apartments located on Winding Way. (Trial Transcript, June 7, 2006, 240). At approximately 11:00 a.m. that

morning, as he was walking between the apartment buildings, Parlier discovered Jason Montgomery's wallet and jewelry "sitting up on top of snow." (Tr. 152-53, 240-44).

**Estaban Rivera**

As of December 17, 2005, Rivera was employed as a City of Battle Creek Police Officer. (Trial Transcript, June 7, 2006, 247). That morning, Rivera received a dispatch regarding a home invasion and robbery that occurred at 44 New England Street. (Tr. 247). Rivera was also provided with a description of the suspect. (Tr. 248). While Officer Rivera was assisting in the search of Jason Montgomery's assailant, he observed a man matching the suspect's description "going into" the Glenwood Trace Apartments on Winding Way. (Tr. 247-49). Officer Rivera transmitted this information and continued searching until learning that Petitioner was apprehended. (Tr. 248-49).

**William Gensch**

As of December 17, 2005, Gensch was employed as a City of Battle Creek Police Officer. (Trial Transcript, June 7, 2006, 250-51). That morning, Gensch assisted in the investigation of the assault and robbery of Jason Montgomery. (Tr. 251). As part of this investigation, Officer Gensch was dispatched to 172 Winding Way. (Tr. 251-52). Upon arriving at this location, Gensch observed Officer Kusler and Officer Marshall "begin to physically struggle with a male subject." (Tr. 251-52). Officer Gensch immediately exited his vehicle and helped subdue the man. (Tr. 252). Gensch then entered the apartment building from which the male subject exited and began searching for evidence. (Tr. 252). In conducting this search, Officer Gensch discovered the semi-automatic

7

handgun that Petitioner used when robbing and assaulting Jason Montgomery.  (Trial Transcript, June 6, 2006, 137-38; Trial Transcript, June 7, 2006, 252-55).

**Doug Graham**

On the morning of December 17, 2005, Graham, then employed as a City of Battle Creek Police Officer, assisted in the investigation of the assault and robbery of Jason Montgomery. (Trial Transcript, June 7, 2006, 257-58).  As part of this investigation, Officer Graham was dispatched to 172 Winding Way.  (Tr. 258).  When Graham arrived at this location he observed Petitioner "fighting with" Officer Kusler and Officer Marshall.  (Tr. 258-59).  Officer Graham immediately exited his vehicle and "started yelling at [Petitioner] to quit fighting with the officers." (Tr. 259).  Petitioner refused to comply, at which point Graham sprayed Petitioner with pepper spray. (Tr. 259).  The officers were then able to subdue Petitioner.  (Tr. 259-60).

**Trista Poole**

As of December 17, 2005, Poole was employed as a police officer for the City of Battle Creek.  (Trial Transcript, June 7, 2006, 263).  That morning, Poole was dispatched to 44 New England Street to investigate an armed robbery.  (Tr. 263-64).  Upon arriving at this location, Jason Montgomery provided a description of his assailant which Poole then "broadcast. . .over the radio." (Tr. 264-65).

**Brett Weiss**

As of December 17, 2005, Weiss was employed as a crime technician for the Battle

8

Creek Police Department.  (Trial Transcript, June 7, 2006, 270-71).  Weiss collected and processed the various items of evidence recovered in this matter.  (Tr. 271-91).

**Tara Wesseldyk**

As of December 17, 2005, Wesseldyk was employed as a laboratory technician with the Battle Creek Police Department Forensic Science Unit.  (Trial Transcript, June 7, 2006, 293-94).  Wesseldyk analyzed the contents of the various baggies recovered from Petitioner when he was arrested.  (Trial Transcript, June 6, 2006, 153, 197-98, 201, 219; Trial Transcript, June 7, 2006, 286-87, 297-99).  Wesseldyk determined that the baggies contained marijuana.  (Trial Transcript, June 7, 2006, 297-99).

**Lance Farrow**

Petitioner testified that on the date of December 17, 2005, he was not in the vicinity of Jason Montgomery's residence.  (Trial Transcript, June 7, 2006, 310-11).  Petitioner testified that he was at the Winding Way apartment complex that morning visiting a friend.  (Tr. 311).  Petitioner acknowledged that he was carrying a digital scale and marijuana that morning, but asserted that those items belonged to him not Jason Montgomery.  (Tr. 312).

**William Bohannon**

As of December 17, 2005, Bohannon was employed as a City of Battle Creek Police Officer.  (Trial Transcript, June 7, 2006, 317).  On that date, Officer Bohannon interviewed Petitioner following his arrest.  (Tr. 317-18).  Bohannon first informed Petitioner of his Miranda

rights. (Tr. 318-19). Petitioner indicated that he understood his rights and was willing to waive his rights and speak with Bohannon. (Tr. 319-20).

When Officer Bohannon asked Petitioner to "describe. . .the circumstances that led to his arrest," Petitioner "stated that he didn't know anything." (Tr. 321). In speaking with Petitioner, Officer Bohannon never indicated to Petitioner Jason Montgomery's race. (Tr. 322). Nevertheless, when Bohannon later told Petitioner that "several pieces of evidence pointed towards him," Petitioner responded, "I don't know what that white dude's talking about." (Tr. 321-22).

Following the presentation of evidence the jury found Petitioner guilty of one count each of armed robbery, kidnapping, first degree home invasion, and possession of marijuana, as well as three counts of possessing a firearm during the commission of a felony, two counts of being a felon in possession of a firearm, and two counts of resisting and opposing a police officer. (Trial Transcript, June 7, 2006, 371). Petitioner was sentenced to serve 35-65 years in prison on the armed robbery and kidnapping convictions and lesser prison sentences on the remaining convictions. (Sentencing Transcript, July 10, 2006, 17-22). Petitioner appealed his convictions in the Michigan Court of Appeals, asserting the following claims:

> I.    Defendant is entitled to a new trial where the trial court denied his request for new counsel.
>
> II.   Defendant is entitled to vacation of the conviction for kidnapping and its attendant felony firearm conviction where there was insufficient evidence to find for this offense.
>
> III.  Defendant was denied a fair trial and his constitutional right to the effective assistance of counsel by his attorney's failure to request the appointment of an expert on eyewitness identification.

IV.     Defendant is entitled to a new trial where prosecutor withheld exculpatory physical evidence.

V.      The prosecutor denied Defendant a fair trial by introducing evidence that there was a footprint from Defendant's boot at the scene of the crime, a fact which was not in evidence.

VI.     Defendant is entitled to a new trial where police officers illegally arrested the Defendant

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Farrow*, 2007 WL 4125267 (Mich. Ct. App., Nov. 20, 2007). Asserting the same claims, Petitioner moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Farrow,* No. 135499, Order (Mich., March 24, 2008). On July 23, 2009, Petitioner initiated the present action in which he asserts the six claims identified above.

## STANDARD OF REVIEW

Farrow's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

11

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at

411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, - - - S.Ct. - - -, 2011 WL 1225705 at *8 (Apr. 4, 2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue."

*Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

I.        **Request for New Counsel**

At the outset of trial, immediately prior to the selection of a jury, Petitioner asked the trial judge if he could be appointed different counsel. (Trial Transcript, June 6, 2006, 6-7). In

14

support of his request, Petitioner asserted that his attorney, Virginia Cairns, had recently visited him in jail and told Petitioner that he "was a bastard for not taking a plea." (Tr. 6). Petitioner further asserted that Cairns stated that "it'd be a pleasure for her to see [Petitioner] guilty." (Tr. 6). Cairns responded that she merely met with Petitioner and "went over and – with him every one of his inconsistent statements that he claims to have found in the police report, showed him the error of his thinking and reiterated what he was facing and what would convict him and it was to no avail." (Tr. 8). Observing that "replacing an attorney on the day of trial is not something that's favored," the trial judge denied Petitioner's request for new counsel on the ground that "there's no reason. . .that your attorney should be replaced." (Tr. 8). Petitioner asserts that the trial judge improperly denied his request for new counsel, thereby entitling him to a new trial.

The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to. . .the Assistance of Counsel for his defense." U.S. Const. amend. VI. While an "essential" element of this right is the right to be represented by "counsel of one's choice," the right to be represented by chosen counsel "is not absolute." *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007) (citing *United States v. Gonzales-Lopez*, 548 U.S. 140, 144 (2006)). When considering a defendant's request to obtain substitute counsel, courts must consider the following factors: (1) timeliness of the request; (2) adequacy of the court's inquiry into the defendant's complaint; and (3) whether the alleged conflict between defendant and counsel is so great that it results in "a total lack of communication preventing an adequate defense." *Mooneyham*, 473 F.3d at 291. The court must balance the defendant's right to counsel of his choice with the public's interest in the prompt and efficient administration of justice. *Id.*

15

An examination of these factors reveals that Petitioner's Sixth Amendment rights were not violated.  Petitioner's request, made at the outset of trial, was untimely.  The trial judge inquired as to the basis of Petitioner's request and discerned no evidence that Petitioner's counsel was incapable of rendering satisfactory performance.  There is also no evidence the alleged conflict between Petitioner and his attorney was so great that it prevented counsel from adequately defending Petitioner.  Finally, as discussed below, there is no evidence that counsel rendered ineffective assistance.

The Michigan Court of Appeals rejected this claim, finding that:

> A mere allegation that the defendant does not have confidence in trial counsel will not justify substitution.  In this case, defendant did not show a genuine issue over the use of a substantial defense or fundamental trial tactic.  Rather, on the first day of trial, he made bald allegations against his counsel's personal treatment of him.  Even if defendant had shown that he had a genuine disagreement over the use of a substantial defense or of a fundamental trial tactic, he would still be required to show that the substitution of counsel would not unreasonably disrupt the judicial process.  Defendant cannot make the requisite showing where he waited until trial to seek substitute counsel.

*Farrow,* 2007 WL 4125267 at *2 (internal citations omitted).

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

## II.         Sufficiency of the Evidence

16

Petitioner asserts that he is entitled to relief because the prosecution failed to present sufficient evidence to support his conviction for kidnapping or the accompanying conviction for possession of a firearm during the commission of a felony.

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury. *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

A.      Kidnapping

As of December 17, 2005, Michigan law contemplated two distinct kidnapping offenses: (1) forcible kidnapping and (2) secret kidnapping. *See People v. Nichols*, 2005 WL 927109 at *1 (Mich. Ct. App., Apr. 21, 2005). The elements of secret confinement kidnapping were: (1) the victim must have been forcibly confined or imprisoned; (2) the victim must have been confined or

imprisoned against his will and without lawful authority; (3) during the course of such confinement the defendant must have kept the victim's location secret; (4) the defendant must have intended the confinement to be secret; and (5) at the time of the secret confinement the defendant must have been acting willfully and maliciously.  The "essence of secret confinement [kidnapping]. . .is deprivation of the assistance of others by virtue of the victim's inability to communicate his predicament." *Id.* Moreover, "absolute, prolonged secrecy" is not required, as "it is enough that secrecy, or the attempt to maintain secrecy, denied the victim the opportunity to avail himself of outside help." *People v. Jaffray*, 519 N.W.2d 108, 118 (Mich. 1994).

The evidence presented at trial revealed that Petitioner forcibly confined Jason Montgomery against his will in a location and under circumstances that prevented Montgomery from communicating with the outside world.  The evidence supported that Petitioner hogtied Montgomery with duct tape and placed him in a room without a telephone, which under Michigan law constitutes evidence that Petitioner intended to secretly confine Montgomery.  *See People v. Warren*, 615 N.W.2d 691, 698-99 (Mich. 2000).  The evidence further revealed that Petitioner acted willfully and maliciously.  The Michigan Court of Appeals found that the prosecutor presented sufficient evidence to convict Petitioner of kidnapping, holding as follows:

> Defendant argues that the victim was not secretly confined, because, shortly after he left the victim, the victim freed himself from the duct tape and telephoned emergency services for assistance.  However, when defendant left the victim's residence, the victim was restrained by duct tape in a room with no telephone.  Binding a victim is circumstantial evidence of an intent to secretly confine and it is appropriate to focus on the channels of communication that are available to the victim.  Although the victim was not confined for a long period, prolonged secrecy is not required; rather, "it is enough that secrecy, or the attempt to maintain secrecy, denied the victim the opportunity to avail himself of outside help."  "The essence of 'secret

18

confinement' as contemplated by the statute is deprivation of the assistance of others by virtue of the victim's inability to communicate his predicament."   We therefore conclude that the prosecutor presented sufficient evidence at trial for a rational jury to convict defendant of kidnapping.

*Farrow,* 2007 WL 4125267 at *3.

The Michigan Court of Appeals rejected Petitioner's insufficiency of the evidence claim.  In light of the aforementioned authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

B.      Possession of a Firearm during the Commission of a Felony

Petitioner asserts that because there existed insufficient evidence to convict him of kidnapping, the related charge of possessing a firearm during the commission of that particular felony is likewise deficient.

Under Michigan then in effect, an individual was guilty of possession of a firearm during the commission of a felony if he: (1) possessed a firearm; (2) during the commission of a felony.  *People v. Akins*, 675 N.W.2d 863, 873 (Mich. Ct. App. 2003).  The evidence presented at trial revealed that Petitioner possessed a firearm while committing felony kidnapping.  The Michigan Court of Appeals rejected Petitioner's claim that there existed insufficient evidence to sustain a conviction of possessing a firearm during the commission of a felony.  As the court observed:

[T]here was sufficient evidence that defendant committed secret

19

> confinement kidnapping, a felony, and the evidence showed that defendant held a handgun while he was binding the victim with duct tape. Therefore, there was sufficient evidence to sustain defendant's felony-firearm conviction.

*Farrow,* 2007 WL 4125267 at *3.

The Michigan Court of Appeals rejected Petitioner's insufficiency of the evidence claim. In light of the aforementioned authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

**III.        Ineffective Assistance of Counsel**

Petitioner next asserts that his trial attorney rendered ineffective assistance when she failed to request the appointment of an expert on eyewitness identification.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom. *See Premo v. Moore*, 131 S.Ct. 733, 739 (2011) (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411 (2009)). To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Premo*, 131 S.Ct. at 739 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 689). Petitioner's burden is to show that "counsel

20

made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 687).

       Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Premo*, 131 S.Ct. at 739 (quoting *Padilla v. Kentucky*, 130 S.Ct. 1473, 1485 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 690). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

       As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one." *Premo*, 131 S.Ct. at 740. Likewise, the standard by which petitions for habeas relief are judged is "highly deferential." Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential. *Id.* (citations omitted). As the Supreme Court recently concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

21

*Id.* (internal citations omitted).

Petitioner asserts that in light of the fact that Jason Montgomery allegedly provided police with inconsistent statements regarding the identity of his assailant, his attorney should have requested the appointment of an expert witness on the topic of eyewitness identification. Even if the Court assumes that counsel's performance was deficient in this regard, Petitioner cannot establish that he was prejudiced thereby.

As the Michigan Court of Appeals correctly observed, Petitioner's counsel cross-examined Montgomery at length regarding his identification of Petitioner as well as alleged discrepancies between his statements to the police and his testimony at trial. *Farrow,* 2007 WL 4125267 at *4. As the Michigan Court of Appeals recognized, counsel adequately pursued the theory that Montgomery misidentified Petitioner as his assailant and Petitioner has presented no evidence that testimony by an expert witness would have advanced his cause. *Id.* Finally, as the Michigan Court of Appeals further recognized, the other evidence of Petitioner's guilt (e.g., Petitioner's possession of numerous items stolen from Montgomery's residence) was quite substantial. *Id.* at *5. In sum, it is not reasonable to conclude that questioning an expert on eyewitness identification (assuming such testimony would have been admissible) would have produced a different result.

The Michigan Court of Appeals rejected Petitioner's ineffective assistance of counsel claim. In light of the authority discussed above and the evidence presented at trial, this determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. This decision was likewise not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief

may be granted.

IV.            **Withholding of Exculpatory Evidence**

As discussed above, Officer Trista Poole was dispatched to Jason Montgomery's residence on December 17, 2005, following Montgomery's telephone call to the police.  Petitioner asserts that his right to a fair trial was denied because the prosecutor failed to provide him with a copy of Officer Poole's police report regarding her December 17, 2005 encounter with Montgomery.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith  or bad faith of the prosecution."  *Wilson v. Mitchell*, 498 F.3d 491, 512 (6th Cir. 2007) (quoting *Brady*, 373 U.S. at 87).  The material which must be disclosed under *Brady* "encompasses impeachment evidence as well as exculpatory evidence."  *Wilson*, 498 F.3d at 512 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)).  To establish a *Brady* violation, Petitioner must establish: (1) the prosecution suppressed or withheld evidence, (2) such evidence was favorable to the defense, and (3) the suppressed evidence was material.  *See Bushard v. Yukins*, 2004 WL 74659 at *1 (6th Cir., Jan. 7, 2004) (quoting *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)).

The materiality requirement is not a sufficiency of the evidence test.  *See In re McDonald*, 514 F.3d 539, 545-46 (6th Cir. 2008) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995)).  In other words, Petitioner is not required to demonstrate that consideration of the undisclosed evidence results in less than sufficient evidence to support his conviction.  This is because "the possibility of an acquittal of a criminal charge does not imply an insufficient evidentiary basis to convict."  *In re McDonald*, 2008 WL 89951 at *5 (quoting *Whitley*, 514 U.S. at 434-35).  Also, the withheld evidence must be considered "collectively, not item by item."  *Whitley*,

514 U.S. at 436-37.  The materiality requirement is satisfied where "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Banks v. Dretke*, 540 U.S. 668, 698 (2004) (quoting *Whitley*, 514 U.S. at 435).  In short, Petitioner must demonstrate a "reasonable probability of a different result." *Dretke*, 540 U.S. at 698 (quoting *Whitley*, 514 U.S. at 434).

Petitioner faults the prosecution for failing to produce Officer Poole's December 17, 2005 police report.[1]  Petitioner asserts that because "the report Mr. Montgomery gave on December 17, 2005 to Officer Poole never gave a description of his perpetrator," the prosecution's failure to divulge such violated his right to a fair trial.  As previously noted, Jason Montgomery testified that when the police arrived at his home on the morning in question he provided a detailed description of his assailant.  Officer Poole likewise testified that when she spoke with Montgomery on December 17, 2005, Montgomery provided her with a description of his assailant which she then broadcast over the radio.  Officers Kusler and Rivera both testified that a description of Montgomery's assailant was broadcast over their radios that morning.  While the police report in question does not contain a *detailed* description of Petitioner, there is nothing in this report suggesting that Montgomery was unable to describe his assailant to Officer Poole.  Considering that Petitioner was captured and positively identified by Montgomery before Poole authored the report in question, it is quite likely that she did not find it necessary to include in her report the details of the description which Montgomery provided to her.

The Michigan Court of Appeals denied this claim on the ground that the police report in question "was not favorable to [Petitioner], and [Petitioner] has failed to show that his possession

---

[1]   A copy of this two-page report is contained within docket entry #19.

of the evidence at trial would have resulted in a different outcome." *Farrow,* 2007 WL 4125267 at

*5. Considering the authority discussed above and the evidence presented at trial, this determination

is neither contrary to, nor involves an unreasonable application of, clearly established federal law.

Moreover, this decision was not based on an unreasonable determination of the facts in light of the

evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be

granted.

## V.          Prosecutorial Misconduct

Petitioner asserts that "the prosecutor denied Defendant a fair trial by introducing

evidence that there was [a] footprint from Defendant['s] boot at the scene of the crime, a 'fact' which

was not in evidence."

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due

process analysis...is the fairness of the trial, not the culpability of the prosecutor." *Serra v. Michigan

Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209,

219 (1982)).  The issue is whether the prosecutor's conduct "so infected the trial with unfairness as

to make the resulting conviction a denial of due process." *Gillard v. Mitchell*, 445 F.3d 883, 897

(6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).   Thus, even if the

challenged conduct was improper, habeas relief is available only where the conduct was "so flagrant

as to render the entire trial fundamentally unfair." *Gillard*, 445 F.3d at 897.

When assessing whether alleged prosecutorial misconduct warrants relief, the Court

undertakes a two part analysis.  The Court must first determine whether "the prosecutor's conduct

and remarks were improper." *Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007).  If such is the

case, the Court must then determine "whether the impropriety was flagrant and thus warrants reversal." *Id.* at 759.  When assessing whether an improper comment resulted in a denial of the right to a fair trial, the Court considers the following factors: (1) the likelihood that the conduct mislead the jury or prejudiced the accused; (2) whether the conduct was extensive or isolated; (3) whether the conduct was deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial.  *Id.*

Petitioner's claim is based on the prosecutor's questioning of Officer Doug Graham. Specifically, Petitioner finds fault with the following exchange between the prosecutor and Officer Graham:

> Q:   Any other involvement in the investigation of this incident?
>
> A:   I stayed with the suspect until he was – he was treated by Lifecare to wash out the pepper spray and all they typically do is wash it out with water and stuff, and then I stayed with the suspect at the station until the crime techs requested that I bring a pair of his shoes out to the scene so they can match it with footprints in the snow.

(Trial Transcript, June 7, 2006, 260-61).

Petitioner asserts that Officer Graham's response "implied that a match was made" between Petitioner's boots and the footprints in the snow.  Petitioner argues that "[t]his was a subtle tactic by the prosecutor to clearly influence and mislead the jury into believing that there was evidence that Petitioner['s] boot matched bootprints at the crime scene."  Even if the Court concedes Petitioner's argument that Graham's response "implied that a match was made," such hardly constitutes misconduct by the *prosecutor* who asked a simple open-ended question.  The Court

discerns nothing improper about the question posed to Graham and, as the Michigan Court of Appeals observed, Graham "never affirmatively testified that defendant's boots matched the prints in the snow." *Farrow,* 2007 WL 4125267 at *6. Moreover, to the extent that Graham's response suggested to the jury that "a match was made," Petitioner had ample opportunity on cross-examination to correct such. That Petitioner's counsel declined to question Graham on the subject, again, hardly constitutes prosecutorial misconduct.

In sum, the Court discerns nothing improper about the prosecutor's question. It is unlikely that the exchange in question mislead the jury or prejudiced Petitioner as Officer Marshall expressly testified that she was unable to match Petitioner's boot with any footprint at the crime scene. (Trial Transcript, June 6, 2006, 210). The conduct in question was isolated and there is no evidence that the prosecutor acted with the intent to deprive Petitioner of a fair trial. Finally, the evidence against Petitioner was substantial.

The Michigan Court of Appeals rejected this claim, finding that Petitioner "has failed to show that any misconduct occurred." *Farrow,* 2007 WL 4125267 at *6. Considering the aforementioned authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## VI.       Illegal Arrest

Finally, Petitioner asserts that he is entitled to a new trial because he was illegally arrested on December 17, 2005. Petitioner further asserts that as a result of his illegal arrest, the

28

evidence recovered subsequent thereto must be suppressed.

First, with respect to Petitioner's arrest, whether such was illegal is irrelevant.[2]  *See Gerstein v. Pugh*, 420 U.S. 103, 118-19 (1975) (recognizing the "established rule" that an illegal arrest does not void a subsequent conviction); *United States v. Crews*, 445 U.S. 463, 474 (1980) ("[a]n illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction"); *Chatman v. Slagle*, 107 F.3d 380, 383 (6th Cir. 1997) ("[a]n illegal search or seizure affects only what evidence the state may introduce, not whether a prosecution may go forward and a conviction obtained").  As for Petitioner's claim that the evidence seized subsequent to his arrest must be suppressed, the Court notes that Fourth Amendment claims such as this are not cognizable in habeas corpus cases.  *See Stone v. Powell*, 428 U.S. 465 (1976).

In *Stone*, the Court addressed the question "whether state prisoners who have been afforded the opportunity for full and fair consideration of their reliance upon the exclusionary rule with respect to seized evidence by the state courts at trial and on direct review may invoke their claim again on federal habeas corpus review."  *Id.* at 489.  The Court indicated that the answer to this question "is to be found by weighing the utility of the exclusionary rule against the costs of extending it to collateral review of Fourth Amendment claims."  *Id.*

After examining the purpose of the exclusionary rule, as well as the societal costs exacted by its application, the Court concluded that "these considerations support the implementation of the exclusionary rule at trial and its enforcement on direct appeal of state-court convictions.  *Id.*

---

[2]  While resolution of the legality of Petitioner's arrest is not necessary to resolve this claim, Petitioner's arrest certainly appears to be legal as a warrantless arrest is legal when an officer has probable cause to believe that the individual committed a felony.  *See Peoples v. United States*, 2010 WL 4279121 at *4 (W.D. Mich., Oct. 25, 2010) (citing *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983)).

at 489-93.  The Court further concluded, however, that "the additional contribution, if any, of the consideration of search-and-seizure claims of state prisoners on collateral review is small in relation to the costs."  *Id.* at 493.  Accordingly, the Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  *Id.* at 494.  The Court, in a subsequent footnote, indicated that "an opportunity for a full and fair litigation" contemplated evaluation of the Fourth Amendment claim in question "at trial and on direct review."  *Id.* at 494 n. 37.

       The Sixth Circuit has held that to determine whether a petitioner was afforded a "full and fair" opportunity to litigate his Fourth Amendment claim, the court must undertake a two-prong analysis.  *See Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir. 2000) (citing *Riley v. Gray*, 674 F.2d 522 (6th Cir 1982)).  The court must first determine whether the State has a procedural mechanism that, in the abstract provides an opportunity to present a Fourth Amendment claim. Assuming the State provides such a mechanism, the question then becomes whether the presentation of the claim was frustrated by a failure of that mechanism.  *See Machacek*, 213 F.3d at 952 (citing *Riley*, 674 F.2d at 526).

       Pursuant to Michigan court rules, criminal defendants can challenge the admissibility of evidence during a preliminary examination or in the trial court. M.C.R. 6.110(D).  Michigan court rules further provide criminal defendants with the right to appeal should such a challenge prove unsuccessful.  M.C.R. 7.203(A)(1).  The mechanisms provided by the State of Michigan are, therefore, clearly adequate.  *See Riley*, 674 F.2d at 526.  With respect to the second prong of the analysis, Petitioner has neither asserted nor demonstrated that the available procedural mechanisms

30

failed or that his attempts to employ such were frustrated.  The Court, therefore, finds that the State of Michigan afforded Petitioner "an opportunity for full and fair litigation of [his] Fourth Amendment claim."  Accordingly, the Court finds that Petitioner's suppression of evidence claim must be denied as not cognizable.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Farrow's petition for writ of habeas corpus be **denied**.  The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  June 20, 2012                          /s/ Ellen S. Carmody
                                               ELLEN S. CARMODY
                                               United States Magistrate Judge

31